1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                          EASTERN DISTRICT OF CALIFORNIA

8

9   CALIFORNIA SPORTFISHING              No. 2:10-CV-01207-GEB-AC
    PROTECTION ALLIANCE, a non-
10  profit corporation,

11                Plaintiff,             **ORDER GRANTING IN PART AND**
                                         **DENYING IN PART EACH PARTY'S**
12        v.                             **SUMMARY JUDGMENT MOTION**

13  CHICO SCRAP METAL, INC., a
    California corporation;
14  GEORGE SCOTT, SR.,
    individually and as trustee
15  of GEORGE W. SCOTT, SR.
    REVOCABLE INTER VIVOS TRUST
16  DATED SEPTEMBER 25, 1995,

17                Defendants.

18

19        Pending are cross motions for summary judgment on the

20  claims alleged in Plaintiff's Third Amended Complaint ("TAC")

21  under the federal Clean Water Act ("CWA") and California Health &

22  Safety Code section 25249.

23                  **II.   UNCONTROVERTED FACTS**[1]

24        Defendants "own and/or operate the [scrap metal

25  recycling] facility located at 1855 Kusel Road in Oroville,

26  California ('the Facility')." (Pl.'s SUF ¶¶ 1, 8, ECF No. 189.)

27  _____
    [1]   The following facts concerning the motions are either admitted or
28  "deemed" uncontroverted since they have not been controverted with specific
    facts as required by Local Rule 260(b).

                                        1

1    "The [F]acility's primary purpose is to receive, separate, and

2    ship recyclable . . . scrap metals, plastics, and CRV items

3    (bottles and cans). . . . The received materials are separated at

4    the facility, bailed and shipped." (Packard Decl. Ex. SS, Resp.

5    No. 12 p. 9, ECF No. 168-7.) The Facility has "stockpiles of

6    metal and other debris" and "[m]ost of the industrial activities

7    at the Facility occur outdoors." (Pl SUF ¶ 11.) When it rains,

8    "[s]torm water associated with [the Facility's] industrial

9    activities is discharged from the Facility." (Pl.'s SUF ¶ 10.)

10                        **II.   LEGAL STANDARD**

11              A party is entitled to summary judgment if
             "the movant shows that there is no genuine
12           dispute as to any material fact and the
             movant is entitled to summary judgment as a
13           matter of law." . . . The moving party has
             the burden of establishing the absence of a
14           genuine dispute of material fact.

15   City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1049 (9th Cir.

16   2014) (quoting Fed. R. Civ. P. 56(a)) (citing Celotex Corp. v.

17   Catrett, 477 U.S. 317, 323 (1986)). "A fact is 'material' when,

18   under the governing substantive law, it could affect the outcome

19   of the case." Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav.

20   Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v.

21   Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A "dispute about

22   a material fact is 'genuine,' . . . if the evidence is such that

23   a reasonable jury could return a verdict for the nonmoving

24   party." Anderson, 477 U.S. at 248. Summary judgment "evidence

25   must be viewed in the light most favorable to the nonmoving

26   party, and all reasonable inferences must be drawn in favor of

27   that party." Sec. & Exch. Comm'n v. Todd, 642 F.3d 1207, 1215

28   (9th Cir. 2011) (citing Johnson v. Paradise Valley Unified Sch.

1    <u>Dist.</u>, 251 F.3d 1222, 1227 (9th Cir. 2001)).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

7    Fed. R. Civ. P. 56(c)(1).

> However, if the nonmovant does not "specifically . . . [controvert duly supported] facts identified in the [movant's] statement of undisputed facts," the nonmovant "is deemed to have admitted the validity of the facts contained in the [movant's] statement." <u>Beard v. Banks</u>, 548 U.S. 521, 527 (2006). A district court has "no independent duty 'to scour the record in search of a genuine issue of triable fact.'"

<u>Simmons v. Navajo Cnty., Ariz.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010) (quoting <u>Keenan v. Allan</u>, 91 F.3d 1275, 1279 (9th Cir. 1996)).

## III. DISCUSSION

### A.    Objections

#### 1.    Rule 26

Each party objects to what it characterizes as expert testimony evidence; Plaintiff moves to strike the declaration of Bryan Gartner submitted in support of Defendants' motion and Defendants move to exclude paragraphs 13-22 and the attached exhibits L-U from the Declaration of John Lane submitted in support of Plaintiff's motion.

Each objection is made under Federal Rule of Civil Procedure 26(a)(2)(B), which requires a party to disclose a written report for an expert witness who "is retained or

specially employed to provide expert testimony in the case;" the report must include "<u>a complete statement of all opinions the witness will express and the basis and reasons for them; the facts of data considered by the witness in forming them; [and] any exhibits that will be used to summarize or support them.</u>" (emphasis added.)

Plaintiff argues the Gartner declaration offers expert testimony and therefore Defendants violated Rule 26 by not disclosing his opinions earlier. Defendants counter the declaration does not contain expert testimony and instead discloses Gartner's personal observations based on his work at the Facility.

The Gartner declaration details Gartner's work conducted on behalf of Defendants in connection with the Facility's efforts to comply with a Department of Toxic Substance Control Order. Plaintiff has not shown that the subject matter of Gartner's declaration was subject to Rule 26's disclosure requirements. Therefore, Plaintiff's motion challenging the declaration is denied.

Defendants argue the referenced portions of Lane's declaration should be excluded because they include new opinions on the adequacy of the Facility's Best Management Practices ("BMPs").

Plaintiff responds that although Lane was retained as an expert on whether discharges from the Facility reach the Feather River, his factual statements regarding BMPs serve only to authenticate Exhibits L-U, which are photographs he took of the Facility, and therefore the referenced portions of his

declaration are not subject to the expert disclosure rule. Plaintiff argues that even though lane took the photographs he has not given an opinion based on what is depicted in the photographs.

Exhibits L-U attached to the Lane declaration are photographs of the Facility, and paragraphs 13-22 of the declaration declare when and how Lane took the referenced photographs. Therefore, Defendants have not shown the referenced portions of Lane's declaration are subject to Rule 26's disclosure requirements and their motion challenging the declaration is denied.

**2.   Evidentiary Objections to Declarations**

Plaintiff submitted 126 evidentiary objections to the content of the declarations Defendants submitted in support of their motion and their opposition to Plaintiff's motion. Each objection has been considered. The objections are raised under Federal Rules of Evidence 701, 703, and/or 802, and the discussion in this Order infra herein reveals each objection is either sustained or overruled.

**B.   Plaintiff's Requests for Judicial Notice**

Plaintiff supports its motion with a request that judicial notice be taken of exhibits A-N attached to its Request for Judicial Notice (ECF No. 166), and supports its opposition to Defendants' motion with a request that judicial notice be taken of exhibits A-B attached to a second Request for Judicial Notice. (ECF NO. 182.) Defendants oppose judicial notice being taken of exhibits C-F, I-K, and M-N that support Plaintiff's motion and exhibit A that supports Plaintiff's opposition.

1    Each document for which Plaintiff requests judicial

2  notice is, with the exception of Exhibit I, a government record.

3  Government records are susceptible to judicial notice when

4  "relevant to an[] issue" before the court. <u>Flick v. Liberty Mut.</u>

5  <u>Fire Ins. Co.</u>, 205 F.3d 386, 392 n.7 (9th Cir. 2000) ("In this

6  case though, we deny such a request [for judicial notice],

7  because the [documents] are not relevant to any issue on

8  appeal."). Plaintiff has shown that each of these exhibits is

9  relevant to the pending motions. Therefore, its request for

10  judicial notice of these exhibits is granted.

11    Plaintiff, however, has not shown Exhibit I, a report

12  created by a third-party titled "Lower Feather River HUC/Honcut

13  Creek Watershed, Existing Condition Assessment," is susceptible

14  to judicial notice. Therefore, Plaintiff's request for judicial

15  notice of Exhibit I is denied.

16    **C.   Jurisdictional Issues**

17    The parties seek summary judgment on the following

18  issues concerning the federal court's subject matter

19  jurisdiction: whether Plaintiff has sufficiently established the

20  element of its CWA claims that requires it to show the discharges

21  about which it complains are into "navigable waters," and whether

22  Plaintiff has established it has standing to prosecute this

23  lawsuit.

24    **1.   "Navigable Waters"**

25    An essential element of Plaintiff's CWA claims requires

26  it to show the pollutant discharges about which it complains were

27  discharged "into navigable waters [of the United States] without

28  a permit." <u>United States Dep't of Energy v. Ohio</u>, 503 U.S. 607,

611 (1992). Here "[t]he [relevant definition of the] term 'waters of the United States' means[:] All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide." 33 C.F.R. § 328.3(a)(1). The Feather River is a navigable water of the United States. See N. Bloomfield Gravel-Mining Co. v. United States, 88 F. 664, 665 (9th Cir. 1898) (finding the Feather River to be navigable).

Plaintiff argues the Facility discharges pollutants into the Wyman Ravine, from which water flows into the Honcut Creek and then into the Feather River, and that since the Wyman Ravine is a tributary of the Feather River, it is considered "navigable waters" of the United States under the CWA. The uncontroverted facts establish that the Wyman Ravine, Honcut Creek, and Feather River are downstream from the Facility, and that the Feather River specifically is 19 miles downstream of the Facility. (Defs.' SUF ¶¶ 21-23.)

Plaintiff argues sufficient connectivity exists between the Facility and the Feather River to establish that the Facility's pollutants discharge into "navigable waters." Plaintiff cites as support for its position, the report of its geologist, John Lane, in which Lane opines that discharges from the Facility flow into a ditch running parallel to Kusel Road and then into an unnamed seasonal intermittent stream; and from the stream, water flows for 1.5 miles before discharging into the Wyman Ravine, which is hydrologically connected to Honcut Creek and the Feather River. (Lane Decl. Ex. A pg. 4-5, ECF No. 170-1.)

Lane states in his report:

> On April 4, 2011, [he] observed continuous storm water flow from the Facility under Kusel Road . . . into the unnamed seasonal stream, past a stockpond approximately 30 feet in diameter and into Wyman Ravine. This inspection was conducted from a helicopter and the flight is documented in [photographs attached to his report].

(Lane Decl. Ex. A p. 5, ECF No. 170-1.) Plaintiff argues Lane's report demonstrates the Facility's pollutants discharge into navigable waters since the Wyman Ravine is a tributary of the Feather River, and under the CWA, tributaries of navigable waters are themselves considered navigable waters. (Pl. Mot. 16:20-25.)

Defendants argue that Lane's personal observations of connectivity between the Facility and the Wyman Ravine are "pure speculation" since Lane "initially provided no evidence of connectivity [and notwithstanding his deposition testimony that he observed such connectivity and took photographs of his observations,] the "photographs fail to establish a clear and unbroken connection between the Facility and the Wyman Ravine." (Def. Mot. 17:5; 17:24-27.)

If other bodies of water are conduits for the Facility's discharges to "seep into the navigable [Feather River]," and the Facility's discharges "significantly affect the physical, biological, and chemical integrity of the [Feather] River," then the Facility's discharges are "subject to the CWA." N. Cal. River Watch v. City of Healdsburg, 496 F.3d 993, 996 (9th Cir. 2007) (interpreting Rapanos v. United States, 547 U.S. 715 (2006)). "Even . . . intermittent . . . [seepage is sufficient]." Headwaters, Inc. v. Talent Irrigation Dist., 241 F.3d 526, 534

1   (9th Cir. 2001).

2   Since Plaintiff has shown discharges from the Facility

3   reach the Wyman Ravine and the Wyman Ravine seeps into the

4   Feather River, Plaintiff's motion on this issue is granted and

5   Defendants' motion is denied.

6   **2.   Standing**

7   Concerning the issue of standing, the uncontroverted

8   facts establish that Plaintiff California Sportfishing Protection

9   Alliance is a non-profit corporation. (Pl SUF ¶ 165.) A non-

10  profit organization "has standing to bring suit on behalf of its

11  members when [1] its members would otherwise have standing to sue

12  in their own right, [2] the interests at stake are germane to the

13  organization's purpose, and [3] neither the claim asserted nor

14  the relief requested requires the participation of individual

15  members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw

16  Envt'l Servs. (TOC), Inc., 528 U.S. 167, 181 (2000). Plaintiff

17  bears the burden of establishing standing, and as "an

18  indispensable part of the plaintiff's case, [it] must be

19  supported in the same way as any other matter on which the

20  plaintiff bears the burden of proof." Lujan v. Defenders of

21  Wildlife, 504 U.S. 555, 561 (1992).

22  Plaintiff satisfies the second and third elements of

23  organizational standing since its claims do not require the

24  participation of individual members and the interests at stake

25  are germane to the organization's stated purpose, which is "the

26  preservation of land and aquatic habitat for scientific, . . .

27  [and] recreational . . . opportunities." (Pl.'s SUF ¶ 166.) The

28  parties dispute whether Plaintiff meets the first prong of the

9

1  standing inquiry which requires Plaintiff to evince that one of

2  its members has standing to sue in his or her own right. To

3  establish individual standing:

> First, the [member] must have suffered an
> 'injury in fact'—an invasion of a legally
> protected interest which is (a) concrete and
> particularized and (b) actual or imminent,
> not conjectural or hypothetical. Second,
> there must be a causal connection between the
> injury and the conduct complained of—the
> injury has to be fairly traceable to the
> challenged action of the defendant, and not
> the result of independent action of some
> third party not before the court. Third, it
> must be likely, as opposed to merely
> speculative, that the injury will be
> redressed by a favorable decision.

12  Lujan, 504 U.S. at 560-61 (emphasis added). To demonstrate

13  standing, Plaintiff presents three of its members as standing

14  witnesses: Bill Jennings, Jim Crenshaw, and Chris Shutes

15  (collectively the "Standing Witnesses"), who gave deposition

16  testimony regarding their use of the Feather River.

17       Defendants argue Plaintiff cannot demonstrate the

18  Standing Witnesses suffered an injury in fact fairly traceable to

19  Defendants' conduct. Specifically, Defendants argue that the

20  deposition testimony of each Standing Witnesses reveals that none

21  of them have used either the Wyman Ravine or the Honcut Creek, as

22  required to show an injury that is fairly traceable to the

23  Facility, and that the types of aesthetic and recreational harm

24  about which each Standing Witness complains is insufficient to

25  demonstrate an injury in fact. Jennings did not discuss the Wyman

26  Ravine during his deposition and could not recall spending time

27  at Honcut Creek, (Cannata Decl. ISO Def. Mot. Ex. D, 74:1-13;

28  77:10-13, ECF No. 195); and Crenshaw and Shutes each testified he

1   had never been on the Honcut Creek or the Wyman Ravine. (Cannata

2   Decl. ISO Def. Mot. Ex. B, 77:1-5, ECF No. 195; Cannata Decl. ISO

3   Def. Mot. Ex. F, 122:18-21; 155:21-156:1, ECF No. 195.)

4          Plaintiff responds that the Standing Witnesses

5   "testified to historical and ongoing use of" the Feather River,

6   which demonstrates their injuries are fairly traceable to

7   Defendants' conduct since the Feather River is only 19 miles from

8   the Facility. The uncontroverted facts establish the Feather

9   River is 19 miles downstream of the Facility and that the

10  Standing Witnesses each use the Feather River for aesthetic and

11  recreational purposes. (Defs.' SUF ¶ 23; Pl.'s SUF ¶¶ 173-176.)

12         "[E]nvironmental plaintiffs adequately allege injury in

13  fact when they aver that they use the affected area and are

14  persons 'for whom the aesthetic and recreational values of the

15  area will be lessened' by the challenged activities." Friends of

16  the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S.

17  167, 183 (2000) (finding a standing witness who "canoed

18  approximately 40 miles downstream" from the facility at issue,

19  but who stated their enjoyment of the land was diminished by the

20  defendant's alleged discharge of mercury in violation of the CWA

21  "adequately documented injury in fact").

22         The Standing Witnesses' aesthetic and recreational use

23  of the Feather River evince that they have "reasonable concerns

24  about the effects of [Defendants'] discharges" on their interests

25  in the Feather River. Laidlaw, 528 U.S. at 184. Since the Feather

26  River is approximately 19 miles downstream from the Facility,"

27  (Defs.' SUF ¶ 23), it is sufficiently close to the Facility to

28  demonstrate each Standing Witnesses' injury is fairly traceable

1   to Defendants' conduct. <u>Laidlaw</u>, 528 U.S. at 183. Therefore, on

2   this issue, Plaintiff's motion is granted and Defendants' motion

3   is denied.

4       **D.    CWA Claims**

5           The parties cross move for summary judgment on

6   Plaintiff's claims alleged under the CWA, in which Plaintiff

7   alleges Defendants engaged in conduct proscribed by the CWA by

8   violating the terms of California's General Industrial Storm

9   Water Permit (the "General Permit"), which Defendants were

10  issued.

11          "The Clean Water Act prohibits the discharge of

12  pollutants from a 'point source' into the waters of the United

13  States without a permit issued under the terms of the National

14  Pollution Discharge Elimination System [("NPDES")]." <u>Envt'l Def.</u>

15  <u>Ctr., Inc. v. United States EPA</u>, 344 F.3d 832, 841 (9th Cir.

16  2003). "The discharge of pollutants without an NPDES permit, or

17  in violation of a permit, is illegal." <u>Waterkeepers N. Cal. v. AG</u>

18  <u>Indus. Mfg., Inc.</u>, 375 F.3d 913, 915 (9th Cir. 2004). "An NPDES

19  permit serves to transform generally applicable effluent limits

20  and other standards . . . into obligations . . . of the

21  individual discharger." <u>Envt'l Prot. Agency v. Cal. ex rel. State</u>

22  <u>Water Res. Control Bd.</u>, 426 U.S. 200, 205 (1976). NPDES permits

23  are issued by [the] EPA or States that have been authorized by

24  EPA to act as NPDES permitting authorities." <u>Envt'l Def. Ctr.,</u>

25  <u>Inc. v. US EPA</u>, 344 F.3d 832, 841 (9th Cir. 2003).

26          Much of the responsibility for administering
            the NPDES permitting system has been
27          delegated to the states. States may issue
            individual permits to industrial discharges
28          or may cover many discharges under the terms

> of one general permit. California has issued a general permit to cover industrial discharges. In order to be covered under California's General Permit, individual dischargers must file a notice of intent with the state."

*Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 915 (9th Cir. 2004). Defendants filed "a notice of intent" with the California Regional Water Board ("Water Board"), which was approved on December 10, 2007. (Defs.' SUF ¶¶ 1, 5, ECF No. 184.) "Private citizens may sue under the Clean Water Act to enforce the specific provisions of [the] California[] General Permit." *Waterkeepers N. Cal.*, 375 F.3d at 915 (citing 33 U.S.C. § 1365(a)(1), (f)(6)).

Plaintiff alleges Defendants violated the terms of the General Permit as follows: (1) discharging contaminated storm water contrary to Section C of the General Permit; (2) failing to develop and implement an adequate Storm Water Pollution and Prevention Plan ("SWPPP") contrary to Section A of the General Permit; (3) failing to implement Best Available Technology Economically Achievable ("BAT")/Best Conventional Pollutant Control Technology ("BCT") contrary to Order B of the General Permit; and (4) failing to implement an adequate Monitoring and Reporting Plain ("MRP") contrary to Section B of the General Permit.

### 1.   Storm Water Discharges

Both parties seek summary judgment on Plaintiff's claim that Defendants violated Section C of the General Permit 131 times by failing to submit a report to the Water Board when the Facility's storm water discharges contained levels of copper,

1   lead, and/or zinc in excess of the applicable water quality

2   standards.

3           Section C(2) of the General Permit states in part:
            Storm water discharges . . . shall not <u>cause</u>
4           <u>or contribute to an exceedance of any</u>
            <u>applicable water quality standards</u> contained
5           in a Statewide Water Quality Control Plan or
            the applicable Regional Water Board's Basin
6           Plan.

7   (General Permit Pg. 4.) However, Section C(3) states:

8           A Facility operator will not be in violation
            of [Section] C.2. as long as the facility
9           operator has implemented BMPs that achieve
            BAT/BCT and . . . [t]he facility operator ...
10          submit[s] a report to the appropriate
            Regional Water Board that describes the BMPs
11          that are currently being implemented and
            additional BMPs that will be implemented to
12          prevent or reduce any pollutants that are
            causing or contributing to the exceedance of
13          water quality standards.

14  (General Permit p. 4.) Section C(4) states:

15          [the referenced report must be submitted to
            the Water Board] within 60 days after either
16          the Facility operator or the . . . Water
            Board determines that discharges are causing
17          or contributing to an exceedance of an
            applicable water quality standard.

18

19  (General Permit pgs. 4-5.) The uncontroverted facts establish

20  that Defendants did not submit a report to the Water Board in

21  response to a storm water discharge exceeding an applicable water

22  quality standard. (Pl.'s SUF ¶ 164.)

23          Plaintiff argues the California Toxic Rules standards

24  ("CRT standards") are "an[] applicable water quality standard"

25  under the General Permit, and that samples of water discharged

26  from the Facility on 131 occasions show levels of copper, lead,

27  and/or zinc in excess of the CTR standards. (See Pl.'s SUF ¶¶

28  115-163.)

                                    14

1        The CTR "promulgates criteria for priority toxic
2  pollutants for the State of California." 40 C.F.R. 131.38. For
3  storm water discharges, the following pollutant concentrations
4  apply:

5        Copper: 0.013 mg/L

6        Lead: 0.065 mg/L

7        Zinc: 0.12 mg/L

8  Id.

9        Defendants argue the CTR standards are inapplicable to
10  the Facility and therefore they were not required to report to
11  the Water Board each time a sample revealed levels of copper,
12  lead, and/or zinc in excess of the CTR standards. Defendants
13  further argue that even if they were required to report such
14  discharges, Plaintiff has not presented evidence demonstrating
15  that a portion of the 131 water samples Plaintiff references
16  represent the Facility's water quality since Plaintiff has not
17  shown that the samples came from inside the Facility.

18        Plaintiff argues that by failing to file reports with
19  the Water Board, Defendants violated section C2 of the General
20  Permit, citing Santa Monica Baykeeper v. Kramer Metals,
21  Inc.("Kramer"), 619 F. Supp. 2d 914 (C.D. Cal. 2009), in support
22  of their position. In Kramer a plaintiff sued a scrap metal
23  recycling facility contending its storm water discharge samples
24  contained levels of chemicals exceeding the CTR, and contended
25  since defendant failed to report the excess levels to the Water
26  Board, it violated Section C of the General Permit. Id. at 926.
27  The Kramer defendant countered that the General Permit did not
28  require it to report violations of the CTR standards. The Kramer

15

1   court disagreed, stating "the [CTR standard] is a water quality

2   standard that applies to [Defendant]." Id. The court reasoned

3   that "[t]he CTR [standards] expressly appl[y] to 'all waters' for

4   'all purposes and programs under the Clean Water Act'" and that

5   storm water discharges are "regulated by the General Permit,"

6   which requires "adherence to water quality standards," including

7   the CTR standards. Id. at 927.

8        Defendants argue Kramer was wrongly decided and that

9   the "CTR's criteria . . . are not applicable to storm water

10  discharges . . . and do not establish compliance or noncompliance

11  with the General Permit," relying primarily on Divers' Envt'l

12  Conservation Org. v. State Water Res. Control Bd., 145 Cal. App.

13  4th 246, 256 (2006), EPA statements, and statements from a Water

14  Board employee. In Divers, the California Court of Appeal stated:

15  "In regulating storm water permits the EPA has repeatedly

16  expressed a preference for doing so by way of BMP's rather than

17  by way of imposing . . . water quality-based numeric

18  limitations." Defendants also cite to an EPA report entitled,

19  "Economic Analysis of the California Toxic Rules," in which the

20  EPA states "[t]he State of California has significant flexibility

21  and discretion as to how it chooses to implement the CTR within

22  the NPDES permit program," and argue therefore the CTR standards

23  were not meant to constitute a per se violation of the General

24  Permit. (Def. Opp'n 17:16-18.) Defendants further argue that

25  Water Board scientist Scott Zaitz gave deposition testimony that

26  to his knowledge the CTR are not part of the General Permit.

27  (Cannata Opp'n Decl. Ex. A 135:14-22, ECF No. 195-1.)

28        Plaintiff replies that Divers is inapposite since the

16

1    _Divers_ court was not analyzing the General Permit, and

2    Defendants' reliance on the EPA's Economic report "does not

3    support . . . conclu[ding] that the CTR [standards are

4    inapplicable to facilities covered by the General Permit]" since

5    _Kramer_ "specifically rejected the argument that Defendants repeat

6    here." (Pl. Reply 10:6-8; 9:16-19.) Plaintiffs also respond that

7    Defendants citation to Zaitz's testimony is unpersuasive since he

8    was "not speaking on behalf of the Water Board" and his testimony

9    "relates solely to his own practice." (Pl. Reply 10:22-23; 11:3-

10   4.)

11           CTR standards state:

12           [The] EPA . . . promulgate[d] [the standards]
             to fill a gap in California water quality
13           standards that was created in 1994 when a
             State court overturned the State's water
14           quality control plans which contained water
             quality criteria for priority toxic
15           pollutants. Thus, the State of California has
             been without numeric water quality criteria
16           for many priority toxic pollutants as
             required by the [CWA], necessitating this
17           action by [the] EPA.

18   65 Fed. Reg. 31682. _Kramer_ states the CTR "is a water quality

19   standard [as the phrase is used] in the General Permit, [Section]

20   C(2)." 619 F. Supp. 2d at 927.

21           The uncontroverted facts establish Defendants never

22   submitted a report to the Water Board in response to receiving a

23   storm water discharge sampling result that violated a water

24   quality standard. (Pl.'s SUF ¶ 164.) Therefore, each time

25   Defendants received sampling results in excess of the CTR

26   standards, they violated Section C of the General Permit.

27           Plaintiff argues Defendants violated Section C of the

28   General Permit 131 times. Plaintiff argues Defendants' own

                                  17

1   samples reveal sixty-five instances where the level of copper,

2   lead, and/or zinc exceeded the CTR standards, (Pl.'s SUF ¶¶ 118-

3   128, 133, 136, 139, 140, 151-159, 163), and additional samples

4   taken by third-parties reveal sixty-six other instances where the

5   level of copper, lead, and/or zinc exceeded the CTR standards.

6   (Pl.'s SUF ¶¶ 115-117, 129-132, 134-135, 137-138, 141-150, 157,

7   160-162.)

8        Since the evidence concerning the sixty-five samples

9   Defendants collected and analyzed is uncontroverted, Plaintiff's

10  motion concerning these samples is granted and Defendants' motion

11  is denied. Defendants also do not dispute the sample results

12  taken on December 11, 2014 from SWSL2, at 9:10 AM and 2:50PM,

13  which evince four additional violations. (Pl.'s SUF ¶¶ 160-161.)

14  Therefore, Plaintiff's motion as to these samples is granted and

15  Defendants' motion is denied.

16       Defendants argue that Plaintiff fails to demonstrate

17  the remaining samples taken represent the quality of the

18  Facility's storm water discharges since it is not evident that

19  the samples were taken from the Facility or from an outside

20  source; Defendants argue the analysis of this comingled storm

21  water would not accurately reflect the levels of copper, lead,

22  and/or zinc in the Facility's discharges, and therefore unless

23  Plaintiff can identify the source of the remaining water samples,

24  it cannot succeed on its claims based thereon. (Pl.'s SUF ¶¶ 115-

25  117, 129-132, 134-135, 137-138, 141-150, 157.) Plaintiff fails to

26  present evidence that sufficiently identifies the origin of the

27  remaining water samples and consequently has not met its burden

28  to show these samples are the Facility's discharges. Therefore,

1  each motion concerning the remaining sixty-two violations is

2  denied.

3       **2.   Storm Water Pollution Prevention Program ("SWPPP")**

4       The parties cross move for summary judgment on

5  Plaintiff's claim that Defendants violated the General Permit by

6  failing to develop and implement an adequate Storm Water

7  Pollution Prevention Program ("SWPPP").

8            [T]he General Permit requires that permittees
             develop and implement a [SWPPP] that meets
9            certain requirements. The SWPPP has two major
             objectives: (1) to identify and evaluate
10           sources of pollutants and (2) to identify and
             implement site-specific BMPs to reduce or
11           prevent pollutants associated with industrial
             activities in storm water discharges. Section
12           A of the General Permit catalogues with
             significant detail what an SWPPP must contain
13           to comply with the General Permit. A SWPPP
             must contain [inter alia] . . . maps
14           (including a site map).

15  Kramer Metals, Inc., 619 F. Supp. 2d at 920. Plaintiff alleges

16  Defendants violated the General Permit since 1989 because from

17  1989-2007 the Facility did not have a SWPPP and the site maps on

18  the SWPPPs the Facility eventually created are missing required

19  information.

20       **a.   Failure to Develop a Site Map**

21       Plaintiff argues Defendants violated Section E(2) of

22  the General Permit from the time the Facility opened until 2007

23  since it is uncontroverted that the Facility "did not develop any

24  SWPPP" prior to 2007. (Pl SUF ¶ 15.) Section E(2) of the General

25  Permit states: "Facility operators . . . must develop and

26  implement a SWPPP in accordance with [S]ection A of this General

27  Permit when the industrial activities begin." (General Permit

28  p.6.)

Defendants respond that since they created a SWPPP "prior to the date on which [Plaintiff] filed its lawsuit," Plaintiff's claim "is based on a wholly past violation," and therefore summary judgment in their favor is warranted, citing Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49 (1987). (Def. Opp'n 23:23-24.)

In Gwaltney, the Supreme Court held that the CWA requires "that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past [violator] will continue to [violate the CWA] in the future," and that evidence of "wholly past violations" cannot support a citizen-plaintiff's claim under the CWA. Gwaltney, 489 U.S. at 57-58.

Plaintiff filed its initial complaint in this action on March 17, 2010. (ECF No. 1.) Since the uncontroverted facts evince that Defendants created a SWPPP prior to Plaintiff initiating this lawsuit, Plaintiff's claim against Defendants for failing to create a SWPPP alleges a "wholly past violation" for which a citizen-plaintiff cannot sue. Gwaltney, 489 U.S. at 58. Therefore, Plaintiff's motion on this issue is denied and Defendants' motion is granted.

### b.   Failure to Include Required Information

Plaintiff also alleges the Facility's SWPPPs are inadequate since the SWPPP site maps are missing the following required information: (1) points of discharge from the Facility, (2) structural control measures that affect storm water discharge, (3) portions of the Facility's drainage areas that are impacted by run-on from the surrounding area, and (4) areas of

1   soil erosion.

2   ///

3                        **i.   Points of Discharge**

4            Plaintiff argues Defendants violated Section A(4) of

5   the General Permit since "the Facility discharges storm water

6   from the West Gate and from the Southern property boundary, [but]

7   neither of these discharge points have ever been identified [on

8   the SWPPP site map]" as required by Section A(4). (Pl. Mot. 7:14-

9   16 (emphasis added).) Plaintiff supports its position citing the

10  uncontroverted facts that "[t]he Facility maps attached to the

11  2008, 2010, 2012, and 2013 SWPPPs do not identify the West Gate

12  or the west end of the property's southernmost boarder as

13  discharge points." (Pl.'s SUF ¶ 16.)

14           Section A(4) of the General Permit states the SWPPP's

15  site map shall include: "[t]he location of the storm water

16  collection and conveyance system, associated points of discharge,

17  and direction of flow." (General Permit p. 14 (emphasis added).)

18           Defendants respond they did not violate Section A(4) of

19  the General Permit by failing to list the referenced locations as

20  points of discharge since the locations are "not part of [the

21  Facility's] storm water collection and conveyance system." (Def.

22  Opp'n 25:1-2.) Defendants support this argument citing the

23  Declaration of Kim Scott, the Facility's Environmental and Safety

24  Coordinator, who declares the referenced points of discharge "are

25  not part of the Facility's storm water collection conveyance

26  system." (K. Scott Decl. Opp'n ¶ 4, ECF No. 194.)

27           Plaintiff replies that Defendants cannot explain why

28  the referenced discharge points "are not part of [the Facility's]

1  storm water conveyance system," but provides no evidence to rebut

2  Scott's averment. (Pl. Reply 14:11-26.)

3          Section A(4) of the General Permit does not require

4  SWPPP site maps to include points of discharge that are not

5  associated with a facility's storm water collection and

6  conveyance system, and the Scott Declaration evinces that the

7  West Gate and the Southern property boundary are not part of the

8  Facility's storm water collection and conveyance system.

9  Therefore, Plaintiff's motion on this issue is denied and

10  Defendants' motion is granted.

11                    **ii.  Structural Control Measures**

12          Plaintiff argues Defendants violated Section A(4) of

13  the General Permit since the Facility's "SWPPPs call for straw

14  wattles and absorptive socks to be placed around the large . . .

15  scrap metal piles at the Facility," yet "none of these structural

16  BMPs have ever been identified on any of the Facility maps" as

17  required by Section A(4). Plaintiff supports its position citing

18  the uncontroverted facts that the SWPPPs identify straw wattles

19  and absorbent socks as BMPs used at the Facility, yet "no straw

20  wattles or absorbent socks have ever been identified on any of

21  the Facility's SWPPP [site] maps." (Pl.'s SUF ¶¶ 20-21.)

22          Section A(4) of the General Permit states in part that

23  the site map shall include: "any structural control measures that

24  affect storm water discharges." (General Permit p. 14.)

25          Defendants respond that Section A(4) of the General

26  Permit did not require them to identify straw wattles or

27  absorbent socks on the SWPPP site maps since these "are not

28  considered structural BMPs (rather they are considered non-

22

1   structural BMPs).” (Def. Opp’n 25:25-26:2.) Defendants cite in

2   support of their position the averments from Damon Brown,

3   Defendants’ expert geologist, where he avers straw wattles and

4   absorbent socks are non-structural BMPs since “they are not

5   permanent,” and “must be periodically replaced.” (Brown Decl.

6   Opp’n Pl. Mot. ¶ 6, ECF No. 192.) Brown also declares “[s]traw

7   wattles are primarily used to prevent soil erosion,” and

8   “[a]bsorbent socks are primarily used as part of spill clean-up

9   equipment.” (Brown Decl. Opp’n Pl. Mot. ¶¶ 4-5, ECF No. 192.)

10       Plaintiff replies that straw wattles and absorptive

11   socks are structural rather than non-structural BMPs since

12   Defendants have identified them as such in their SWPPPs and

13   “Defendants’ expert . . . conceded that the straw wattles and

14   absorptive socks are structural.” (Pl. Mot. 7:16; Pl. Reply

15   15:10-11.) However Plaintiff’s purported support does not address

16   the distinction between structural and non-structural BMPs.

17       The General Permit states structural BMPs “generally

18   consist of structural devices that reduce or prevent pollutants

19   in storm water discharges and authorized non-storm water

20   discharges.” (General Permit p. 21.)  In contrast, the General

21   Permit states that non-structural BMPs “generally consist of

22   processes, prohibitions, procedures, schedule[s] of activities,

23   etc., that prevent pollutants associated with industrial

24   activities from contacting with storm water discharges and

25   authorized non-storm water discharges. They are considered low

26   technology, cost-effective measures.” (General Permit p. 19.)

27   Non-structural BMPs can include “spill clean-up procedures” and

28   “sediment and erosion control activities.” (General Permit p. 19-

1  20.)

2        Section A(4) of the General Permit does not require a

3  site map to include non-structural BMPs, and averments in Brown's

4  declaration evince that straw wattles and absorptive socks are

5  non-structural BMPs. Since Plaintiff has not sufficiently

6  controverted Defendants' evidence, its motion on this issue is

7  denied and Defendant's motion is granted.

8                  **iii. Drainage Areas Impacted by Run-On**

9        Plaintiff argues Defendants violated section A(4) of

10  the General Permit because "the Facility has historically been

11  subject to significant storm water run-on from an adjacent

12  facility at the southeast corner, causing [water] pooling, [but]

13  neither this run-on nor its associated discharge[s] have ever

14  been identified on any of the Facility's site maps" as required

15  by the General Permit. (Pl. Mot. 7:20-22.) Plaintiff supports its

16  position citing deposition testimony of Kim Scott, Jihan Gray,

17  and Defendants' expert geologist Damon Brown, in which each

18  discusses run-on from an adjacent facility named Apex Lumber

19  ("Apex"). (Pl.'s SUF ¶ 22.)

20        Section A(4) of the General Permit states that site

21  maps shall include "portions of the drainage area impacted by

22  run-on from surrounding areas." (General Permit p. 13.)

23        Defendants argue they were not required to include

24  references to run-on at the southeast corner of the Facility on

25  the SWPPP site map since "there is typically no run-on in that

26  area" and the occasions where run-on has occurred, happened

27  during the "breach of a berm . . . [that] was immediately

28  repaired." (Def. Opp'n 27:22-25.) Defendants support their

                                    24

1   position  citing  the  following  averments  in  Kim  Scott's

2   declaration:

3           [The Facility] is bordered on the south and
            southeast by a facility called Apex Lumber, a
4           logging and forestry equipment sales company.
            During the 2008-2009 and 2009-2010 storm
5           seasons, there was no run-on from the Apex
            facility . . . because, at that time, [the
6           Facility] had large work product piles
            [preventing run-on]. . . .   Prior to the
7           2010-2011 storm season, [the Facility] moved
            the work product piles. . . . [and] Apex
8           agreed to, and did, create a small pond on
            the Apex facility . . . to eliminate run-on
9           .... Unfortunately, during the course of the
            2010-2011 storm season, I noticed slight run-
10          on from Apex on at least one occasion. . . .
            Apex then agreed to, and did create a
11          trenched and bermed area near the southern
            fence line between the Facility and Apex
12          prior to the 2011-2012 storm season. [The
            Facility] personnel inspected this southern
13          fence line/south-eastern corner on a weekly
            basis during the 2011-2012 and 2012-2013
14          storm seasons. Those inspections revealed no
            run-on from Apex to the Facility. During the
15          2013-2014 storm season . . . we experienced a
            significant storm event that overwhelmed the
16          BMPs that we had in place near the southern
            fence line. . . . I noticed a breach of our
17          bermed area . . . . [which] appeared to
            create either runoff or run-on or both (it
18          was difficult to determine) between [the
            Facility] and Apex (basically storm water
19          pooled in this area). I immediately worked
            with a team to place sandbags and hay bales
20          in this area to close off this area of
            comingled storm water. As a result, during
21          the summer of 2014, in advance of the 2014-
            2015 storm season, [the Facility] implemented
22          [a BMP] intended to improve the elevation of
            the southern border and eliminate the
23          potential of run-on from Apex . . . , [which
            has] worked . . . meaning that it is
24          effectively preventing . . . run-on at the
            southern border. . . . Because the issue of
25          run-on . . . at the southern end of the
            Facility was both unintended and immediately
26          repaired (during the storm), I did not
            include reference to run-on from Apex on [the
27          Facility's] site map(s)."

28  (K. Scott Decl. in Opp'n Pl. MSJ ¶¶ 6-7, ECF No. 194.)

Scott's averments evince that the Facility experienced run-on from Apex Lumber at the southeast corner during the 2010-2011 and 2013-2014 storm seasons, which was not referenced on the SWPPP site maps; however, Section A(4) of the General Permit requires site maps to identify "portions of the drainage areas impacted by run-on from surrounding areas." (General Permit p. 13.) Therefore, Plaintiff's motion on this issue is granted and Defendants' motion is denied.

### iv.   Areas of Soil Erosion

Plaintiff argues Defendants violated Section A(4) of the General Permit because "more than half of the Facility is covered in pervious soil, [yet] none of the [SWPPP site] maps identify any 'areas of soil erosion' as required by [Section A(4) of] the [General] Permit." (Pl. Mot. 8:1-3.) Plaintiff supports its position citing the uncontroverted facts that the Facility contains some amount of pervious soil and "Defendants' expert has admitted that none of the Facility [SWPPP site] maps identify any 'areas of soil erosion.'" (Pl.'s SUF ¶¶ 26-27.)

Section A(4) of the General Permit states in part that site maps shall include "[the] direction and flow of each drainage area, on-site surface water bodies, and <u>areas of soil erosion</u>." (General Permit p. 13 (emphasis added).)

Defendants respond that the Facility "does not have any areas of soil erosion" and "[j]ust because there is dirt on the Facility does not mean that there will be soil erosion[,]" contending that "[f]actors such as slope, elevation, compactions, vegetation, place[ment] of straw wattles, and related BMPs impact the potential for erosion." (Def. Opp'n 29:19-20; 29:25-30:1.)

1   Defendants support their position citing the declaration of Damon

2   Brown, in which he avers that "the Facility does not have [areas

3   of soil erosion], and thus they are not required to be listed on

4   the [SWPPP site maps]." (Bond Decl. ISO Def. Mot. ¶ 30, Exs. P,

5   Q, ECF No. 181.)

6        Plaintiff replies that it is unlikely that the Facility

7   has no areas of soil erosion since "over half of the Facility is

8   unpaved and covered with dirt," and asserts that Defendants "have

9   historically had problems controlling their Total Suspended

10  Solids ("TSS")" levels, which indicates that solids such as soil

11  are present in the Facility's storm water discharges. Plaintiff

12  supports its argument citing the Facility's 2009-2010 Annual

13  Report, which indicates that water samples taken from two

14  locations at the Facility showed 697 mg/L and 802 mg/L TSS

15  respectively. (Packard Decl. Ex. Q, CSM 004357, ECF No. 168-4.)

16       It is uncontroverted that the Facility contains some

17  pervious soil. (Pl.'s SUF ¶ 26.) Further, although Defendants'

18  expert opines the Facility contains no areas of soil erosion, the

19  Facility's 2009-2010 Annual Report TSS levels support drawing the

20  reasonable inference that soil from the Facility is eroding into

21  the Facility's water discharges since the TSS level measures

22  solid particles suspended in the discharges. Therefore, each

23  motion on this issue is denied.

24       **3.   Best Available Technology Economically Achievable**

25            **("BAT")/Best Conventional Pollution Control**

26            **Technology ("BCT")**

27       The parties cross move for summary judgment on

28  Plaintiff's claim that Defendants violated General Permit Order

B(3), which states in pertinent part "[f]acility operators covered by this General Permit must reduce or prevent pollutants associated with industrial activity in storm water discharges... through implementation of BAT for toxic and non-conventional pollutants and BCT for conventional pollutants." (General Permit p. 4 (emphasis added).) The CWA discusses the assessment of BAT/BCT in 33 U.S.C. § 1314 (b)(2)(B) as follows:

> Factors relating to the assessment of [BAT] ... shall include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate.

"[T]he factors for assessing BCT are defined at 33 U.S.C. §1314(b)(4)(B) and are similar." Cal. Sportfishing Prot. Alliance v. Cal. Ammonia Co., No. CIV S-05-0952 WBS JMF, 2007 WL 273847, at *7 (E.D. Cal. Jan. 29, 2007).

Plaintiff makes six arguments concerning Defendants' failure to implement BAT/BCT: (1) storm water discharge samples reveal chemical levels in excess of EPA benchmarks; (2) Defendants have not provided covered storage for the Facility's waste piles; (3) Defendants have not implemented modern sweeping technology; (4) Defendants failed to use appropriate filtration media; (5) Defendants failed to properly design and size the filtration units they do use; and (6) Defendants failed to implement BMPs to address dissolved metals.

     **a.   Chemical Levels in Excess of EPA Benchmarks**

1    Plaintiff argues Defendants have not achieved BAT/BCT

2    since the Facility's discharges reveal levels of chemicals in

3    excess of the EPA benchmark levels, which is a per se violation

4    of the General Permit. Plaintiff supports its position citing a

5    compilation chart which shows the Facility's storm water

6    discharge sample results exceed the EPA benchmark for aluminum

7    iron, and zinc. (Gray Decl. Ex. G, ECF No. 177-1.)

8    Defendants respond that discharge levels in excess of

9    the EPA benchmark levels are only circumstantial evidence that

10   the Facility failed to implement BAT/BCT, and contend Plaintiff

11   has not shown the referenced water samples were taken from the

12   Facility. (Def. Mot. 27:24-25.) Defendants argue if the samples

13   were taken from an outside source, the results may not represent

14   the Facility's discharges, and therefore Plaintiff has not shown

15   the Facility violated the General Permit.

16   Plaintiff has not presented evidence identifying the

17   source of the referenced water samples. Therefore, each motion on

18   this issue is denied.

19   **b.   Covered Storage**

20   Plaintiff argues Defendants have not implemented

21   BAT/BCT at the Facility since "Defendants[] [have identified in]

22   SWPPPs . . . stockpiles of . . . metals stored at the Facility as

23   pollutant sources," but these stockpiles "ha[ve] [not been]

24   covered . . . to prevent storm water contact." Plaintiff contends

25   that as a result, "storm water washes through and across the

26   [metal] stockpiles, collecting finely divided toxic heavy metal

27   particulates and sediment, before discharging from the Facility."

28   (Pl. Mot. 8:10-13.) Plaintiff supports its position citing

Defendants' SWPPPs, which list areas of exposed scrap metal as a source of potential pollutants at the Facility, (Packard Decl. Ex. G CSM 000307; Ex. I CSM 000497, ECF Nos. 186-1, 186-2), and the undisputed facts establishing that some of the Facility's metal stockpiles are not covered. (Pl.'s SUF ¶ 29.)

Defendants respond that the Facility is adequately managing its metal stockpiles since water that washes across the stockpiles "encounter[s] [a] myriad [of tools] aimed at filtering sediment." (Def. Opp'n 31:2-3.) Defendants support their position citing Kim Scott's declaration, where she avers the Facility prevents pollutants from leaving the Facility when storm water is discharged through "daily sweeping, two bio-swales, sand filters, vegetated filters, straw wattles & blankets, absorbent socks, berms & grading to direct flow, gravel & baserock to filter storm water, tanks to capture the storm water before it discharges, and a filtering drain inlet box." (K. Scott Decl. ¶ 8, ECF No. 194.)

The uncontroverted facts establish that some of Defendants' metal stockpiles are uncovered; but it has not been shown that covering the stockpiles is necessary in light of how the stockpiles are managed. Therefore each motion is denied on this issue.

### c.    Modern Sweeping Technology

Plaintiff argues the technology Defendants use to trap and capture pollutants before they are released in the Facility's storm water discharges has not achieved BAT/BCT, contending:

> Defendants use [1950's era] "drum" or "brush" sweepers on the Facility's impervious surfaces, [and] this . . . technology . . . has been surpassed by a new generation of "regenerative" sweepers that use a pulse of

1
>                air to dislodge particulate matter together
>                with vacuum hoses to capture and hold fine
2
>                particulate.

3
(Pl. Mot. 8:20-23.) Plaintiff argues Defendants should have

4
implemented this new technology since Plaintiff has documented,

5
"a number of locations [where] . . . distinctly visible piles and

6
rows of fine particulate matter remained on the surface of the

7
Facility" after sweeping. (Pl. Mot. 8:24-26.) Plaintiff cites the

8
uncontroverted fact that Defendants use "drum" or "brush"

9
sweepers, (Pl.'s SUF ¶ 33), and the rebuttal report of

10
Plaintiff's expert geologist, Steven Bond, in which he opines

11
"the Facility's sweeping procedures and the sweeping equipment

12
are wholly inadequate to prevent metal particulates and other

13
debris on the Facility from coming into contact with storm water

14
and discharge[s] from the Facility." (Bond Decl. Ex. B. p 16, ECF

15
No. 167-1.) Specifically Bond declares:

16
17
>                On the . . . September [18,] 2014 site
>                inspection, portions of the Facility had
>                recently been swept[,] . . . [however] large
18
>                portions of the concrete pad [were] . . .
>                left unswept and covered in layers of [debris
19
>                such that] . . . areas of dirt, finely
>                divided metal particulate, and debris [were]
20
>                exposed to rainfall and . . . to storm water
>                runoff . . . . [Defendants' sweepers are] not
21
>                effective at removing the fine particulate
>                materials from within the cracks, joints, and
22
>                fissures of the concrete pavement. Further,
>                [they] obviously cannot sweep close to or
23
>                within the piles or under bins, leaving large
>                portions of the Facility processing areas
24
>                unswept.

25
(Bond Decl. Ex. B. p. 16, ECF No. 167-1.)

26
        Defendants counter, citing the following quoted

27
averments from Damon Brown's declaration: Defendants are not

28

required to use the "regenerative sweepers" Plaintiff references since their current sweeping protocol "is effective," and "keeping the soil at the site for managed reuse [as they can with the drum and brush sweepers] is more beneficial to the environment than sending [the soil] into the waste stream" as would happen if the Facility used a regenerative sweeper. (Brown Decl. ¶ 33, ECF No. 181.) Defendants further rejoin that the Facility "engages in daily sweeping" and that Plaintiff's concerns regarding Bond's September 18, 2014 visit are "of no consequence" since that was "a dry, hot day and no rain was forecasted," and the Facility "engage[s] in much more careful and elaborate sweeping on days on which rain is forecasted." (Def. Opp'n 32:3-14.) Defendants also rely on the following averments from the Declaration of Jihan Gray, the Facility Manager, who avers that between 2007-2008, the Facility "implemented and/or engaged in . . . daily sweeping near scrap metal piles." (Gray Decl. ¶ 3, ECF No. 177.) Defendants also cite the portion of Kim Scott's declaration, where she avers the Facility was swept "prior to [Plaintiff's September 18, 2014] inspection, [but the Facility] did not perform the very thorough sweeping inspection that it typically does prior to or on a day when rain is forecasted." (K. Scott Decl. ¶ 9, ECF No. 194.)

In light of the disputed factual issues each motion on this issue is denied.

### d.   Appropriate Filtration Media

Plaintiff argues the Facility currently uses sand in its water filtration system which is not as effective as other filtration media and that by choosing to use sand, Defendants

1  fail to achieve BAT/BCT. (Pl. Mot. 9:2-5; 9:11-13.) Plaintiff

2  supports its position by citing a report on which Defendants'

3  expert environmental chemist, Barton Simmons, relies in reaching

4  his conclusions, where it was found that filtration media such as

5  compost, packing wood, enviro-media, ash, zeolite, and fine glass

6  are capable of removing zinc from ground water at a 50-97% rate,

7  whereas sand is capable of removing zinc from ground water at a

8  16% rate, and that those same materials removed copper from

9  groundwater at a 39-97% rate, whereas sand removed copper from

10  ground water at a 29% rate. (Packard Decl. Ex. ZZ CSM 026363.)

11      Defendants respond that its sand filters are adequate,

12  and cite the rebuttal report of Plaintiff's expert Steven Brown

13  who states: "Having observed the sand filters at the Facility and

14  having [the] benefit of the observations made at the site during

15  recent 2014 storm events, the design appears sound for its

16  current purpose." (Brown Decl. Ex. P p. 8, ECF No. 181-17.)

17      In light of the factual disputes concerning this issue,

18  each motion is denied.

19          **e.  Properly Designed and Sized Filtration Units**

20      Plaintiff argues even if Defendants' water filtration

21  units used a filtration media other than sand, the units would

22  still fail to achieve BAT/BCT since "the filtration units

23  themselves are so poorly designed and undersized for the volumes

24  of storm water generated at the Facility that storm water

25  [overflows and] bypasses [the water filtration system] without

26  treatment under common, normal rainfall conditions." (Pl. Mot.

27  9:14-17.) Plaintiff supports its position citing Steven Bond's

28  opening report, which states that the Facility's water filtration

1   units have "an inappropriate design and do[] not function as a
2   filter under common, normal rainfall conditions." (Bond. Decl.
3   Ex. A p. 16-17, 38 ECF No. 167-1.)

4        Defendants respond that the Facility's "sand filters
5   are more than adequate to meet the BAT/BCT standards," (Def.
6   Opp'n 32:24), and support their position citing Damon Brown's
7   following deposition testimony: the sand filters are "working
8   well when you look at the monitoring data." (Cannata Opp'n Decl.
9   Ex. C 265:1-267:13, 195-1.)

10       In light of the factual disputes concerning the
11   effectiveness of the Facility's water filtration units, each
12   motion on this issue is denied.

13                  **f.   Dissolved Metals**

14       Plaintiff argues the Facility has not achieved BAT/BCT
15   concerning dissolved metals since water sample results "show...
16   [dissolved] copper, lead, zinc, nickel, chromium and molybendum
17   are discharged" from the Facility, and Defendants "have . . .
18   failed to develop and implement BMPs to address discharges of any
19   dissolved metals, which, by definition, are not [mitigated] by
20   filtration." (Pl. Mot. 10:23; 11:1-3; 11:4-7.) Plaintiff cites
21   two water samples taken from the Facility on December 6, 2007,
22   and relies on Steven Bond's analysis of those samples, where he
23   opines copper, lead, zinc, nickel, chromium and molybdenum are
24   discharged from the Facility in their dissolved form, and
25   concludes "[t]here are no BMPs at the Facility that address the
26   issue of dissolved or dissociated pollutants." (Packard Decl. Ex.
27   W CSM000729-754, ECF No. 168-5; Bond Decl. Ex. A, App'x B Table
28   2, ECF No. 167-1; Bond Decl. Ex. A p.9, ECF No. 167-1.)

1    Defendants counter that the Facility's BMPs address
2    dissolved metals and support their position citing Damon Brown's
3    declaration, where he avers Bond's assessments of the Facility's
4    BMPs are "incorrect" since research has shown the traditional
5    sand filters the Facility uses "have excellent heavy metal
6    removal properties" and have been "effective for the treatment of
7    dissolved metal contaminants commonly found in storm water."
8    (Brown Decl. ISO Def. Mot. Ex. P, p. 8, ECF No. 181-17.)
9    Defendants also rely on a portion of Barton Simmons' declaration
10   where he avers that Bond's methodology was faulty since he relied
11   on two samples, which is an insufficiently small sample size, and
12   the samples he analyzed presented "non-detect" chemical levels,
13   which should not have been used. (Simmons Decl. Opp'n Pl. Mot., ¶
14   11, ECF No. 190.)

15   In light of the factual disputes concerning the
16   Facility's BMPs addressing dissolved metals, each motion on this
17   issue is denied.

18          **4.   Monitoring and Reporting Program ("MRP")**

19   Plaintiff and Defendants cross move for summary
20   judgment on Plaintiff's claim alleging Defendants failed to
21   comply with Section B of the General Permit, which requires
22   Defendants to develop and implement a Monitoring and Reporting
23   Program ("MRP") for the Facility.

24          As part of [a] MRP, a permittee must conduct
            visual observations of storm water throughout
25          the Wet Season; must collect water samples at
            each outfall during specific times; must
26          analyze these samples for specific
            contaminants; and must file Annual Reports
27          with the [Water] Board summarizing the visual
            observation, results of sampling analysis,
28          and General Permit compliance.

35

1   *Santa Monica Baykeeper v. Int'l Metals Ekco, Ltd.*, 619 F. Supp.
2   2d 936, 942 (C.D. Cal. 2009). Plaintiff alleges Defendants' MRP
3   was inadequate since Defendants (1) failed to sample for all
4   required pollutants, (2) failed to consistently sample at each of
5   the Facility's discharge points, and (3) failed to take the
6   required number of samples during the 2012-2013 wet season.

7              **a.   Sampling Required Pollutant Parameters**

8              Each party seeks summary judgment on Plaintiff's claim
9   alleging Defendants violated Section B of the General Permit by
10  failing to test the Facility's water samples for polychlorinated
11  biphenyl ("PCBs"). Defendants further seek summary adjudication
12  on Plaintiff's claim that Defendants violated Section B by
13  failing to test the Facility's water samples for nickel, cadmium,
14  chromium, antimony, arsenic, mercury, molybdenum, and selenium.

15             Section B(5) of the General Permit requires that storm
16  water samples be analyzed for "[t]oxic chemicals and other
17  pollutants that are likely to be present in storm water
18  discharges in significant quantities." (General Permit p. 27.)
19  The General Permit defines "significant quantities" as follows:
20  "the volume, concentration, or mass of pollutant that can cause
21  or threaten to cause pollution, contamination, or nuisance; or
22  adversely impact human health or the environment; and/or cause or
23  contribute to a violation of any applicable water quality
24  standards for the receiving water." (General Permit Attachment
25  4.)

26                        **i.   PCBs**

27             Plaintiff argues Defendants were required to analyze
28  their water samples for PCBs since surface soil samples at the

Facility reveal the presence of PCBs and Defendants' expert Barton Simmons acknowledges PCBs are "ubiquitous" in the scrap metal industry, yet Defendants have not required PCB testing of their storm water samples. (Pl. Mot. 11:9-21; Pl. RJN Ex. H, CSM 002179, ECF No. 166-3.)

Defendants respond "PCBs are virtually insoluble," and so "[t]he probability of the Facility's storm water containing PCBs above the benchmark level is extremely low." (Def. Opp'n 45:11-22.) Defendants cite in support of their position Simmons' Declaration where he avers:

> [w]hether or not PCBs are present in the soil at [the Facility] is somewhat irrelevant to the present case [because] . . . . [t]here is not only no evidence that PCBs in storm water have left [the Facility], but also no reason to expect PCBs in storm water. PCBs are virtually insoluble; . . . . [therefore], [t]he probability of the Facility's storm water containing PCBs above a benchmark is extremely low.

(Simmons Decl. ¶ 6, ECF No. 190.)

Plaintiff disagrees, citing the portion of Steven Bond's declaration where he avers that Simmons' opinion is "not credible" for the following reasons:

> [T]he solubility of PCBs is not a precondition for transport in storm water or any surface water flows. Storm water transports solid and dissolved chemical components alike. Regardless of the solubility of a contaminant, it is subject to transport in solid particulate form. Eroded sediment is transported in storm water mainly as a mass of suspended soil particulates referred to as total suspended solids (TSS). Storm water samples, unless otherwise specified, are analyzed for the total concentrations of contaminants which include total, dissolved, and dissociated chemicals.

1    (Bond Decl. IS Pl. Reply ISO Pl. MSJ ¶ 6, ECF No. 211.)

2         In light of the disputed factual issues concerning

3    whether PCBs are likely to end up in the Facility's storm water

4    and Section B(5)'s requirement that the Facility need only

5    analyze water samples for "pollutants that are likely to be

6    present in storm water discharges in significant quantities,"

7    each motion on this issue is denied.

8                      **ii.  Remaining Chemicals**

9         Defendants seek summary judgment on Plaintiff's claim

10   alleging they violated Section B(5) by failing to test the

11   Facility's water samples for nickel, cadmium, chromium, antimony,

12   arsenic, mercury, molybdenum, and selenium, arguing that

13   significant quantities of these chemicals were not present in the

14   water samples. Defendants support their position citing Barton

15   Simmons' rebuttal report where Simmons states that based on the

16   Water Board's December 2007 sampling, the concentration of

17   nickel, cadmium, chromium, antimony, arsenic, mercury, and

18   selenium were all below the background or benchmark levels, and

19   therefore testing was not required, (Simmons Decl. Ex. B,

20   PLF013760, ECF No. 178-2); and that the Facility's 2010 sampling,

21   which shows the levels of nickel, cadmium and chromium, were

22   below background or benchmark levels. (Simmons Decl. ¶ 7, ECF No.

23   178.) Defendants also argue they were not required to test for

24   the referenced pollutants since Section B(5)(c)(iii) of the

25   General Permit lists circumstances under which a facility need

26   not sample for pollution parameters <u>listed in Table D</u>; however,

27   this argument has not been shown relevant since Plaintiff's claim

28   does not reference pollutants listed in Table D of the General

                                   38

1   Permit. (General Permit p. 43.)

2           Plaintiff responds there is a genuine material factual

3   issue concerning whether Defendants should have analyzed the

4   water samples for the referenced chemicals, arguing the chemicals

5   are likely to be present in the Facility's storm water in

6   significant quantities, citing Steven Bond's expert report, where

7   he states that the referenced chemicals have all been found at

8   the Facility by the government and opines:

9           Based on the nature of the operations at the
            Facility, the types of materials handled and
10          stored at the Facility, and the general lack
            of structural controls and less than ideal
11          housekeeping practices, the above-referenced
            [chemicals] are likely to be present in CMS's
12          storm water discharges in significant
            quantities.
13

14  (Bond Dec. ISO Pl. Mot. Ex. A, p. 35-36, ECF No. 167-1.)

15          In light of the factual dispute concerning whether

16  significant quantities of the referenced chemicals are likely

17  present in the Facility's storm water, each motion on this issue

18  is denied.

19                    **b.   Consistent Sampling**

20          Plaintiff alleges Defendants violated Section B(7) of

21  the General Permit by failing to consistently sample all

22  discharge points at the Facility; specifically Plaintiff alleges

23  Defendants failed to sample: (1) discharge point SWSL1 in 2009-

24  2010; (2) discharge point SWSL1 in 2010-2011; (3) the discharge

25  point at the West Gate in any year; and (4) the discharge point

26  at the southwestern corner at the western end of the southern

27  Property boundary in any year.

28          Section B(7)(a) of the General Permit states "facility

operators shall . . . collect samples of storm water discharges from all drainage areas that represent the quality and quantity of the facility's storm water discharges." (General Permit. P. 28.) However, Section B(7)(d) states:

> [f]acility operators who determine that the industrial activities and [Best Management Practices] within two or more drainage areas are substantially identical may . . . collect samples from a reduced number of substantially identical drainage areas.... Facility operators must document such a determination in the annual report.

(General Permit p. 28.)

### i.   2009-2010 Wet Season

Plaintiff argues Defendants failed to sample the discharge area identified as SWSL1 during the 2009-2010 season, and cites the Facility's 2009-2010 Annual Report, which identifies two discharge locations, SWSL1 and SWSL2. (Pl.'s SUF ¶ 75.)

Defendants respond they were not required to sample SWSL1 since under Section B(7)(a), SWSL1 is substantially identical to SWSL2, which was sampled. The Facility's 2009-2010 Annual Report states discharges from SWSL2 are representative of the discharges from SWSL1:

> The [West Gate] storm water sample location ... is located immediately north of the entrance. The [South West Corner] storm water sample location . . . is located down stream of the West Gate location on the south west frontage of the facility. The flows from the West Gate join the flow at the south frontage of the property at the South West Corner sample location; <u>therefore it was determined that one sample location is representative of both flows</u> and only one sample location (down gradient location) was sample[d] as allowed in Section B7d of the General Permit.

40

1    (Pl.'s SUF ¶ 76; Packard Decl. Ex. Q CSM 4357, ECF No. 168-4)

2    (emphasis added.)

3           Section B(7)(a) of the General Permit states that in

4    order to rely on the storm water samples from SWSL2 as

5    representative of SWSL1, the facility operator must determine

6    "the industrial activities and BMPs" within both areas are

7    "substantially identical." (General Permit p. 28.) However,

8    neither party sufficiently addresses this requirement, and

9    therefore each motion on this issue is denied.

10                    **ii.   2010-2011 Wet Season**

11          Plaintiff argues Defendants were required to sample

12   storm water discharges from SWSL1 during 2010-2011; however, the

13   uncontroverted facts show the 2010-2011 Annual Report does not

14   list SWSL1 as a discharge location. (Pl.'s SUF ¶ 80.)

15          Defendants respond that they were not required to

16   sample storm water discharges from SWSL1 in 2010-2011 since the

17   SWSL1 discharge point was eliminated. (Def. Opp'n 42:7-8.)

18   Defendants support their position citing the portion of Kim

19   Scott's declaration where she avers that at the end of the 2009-

20   2010 storm season, the Facility determined that much of the

21   discharge from SWSL1 was being caused by a neighboring facility,

22   and after she spoke with the neighboring facility, it was

23   determined that "(1) the discharge from SWSL1 was no longer

24   likely due to the improvements [that the neighboring facility

25   stated it would make] and (2) any discharge from SWSL2 would be

26   representative of the industrial activities on the entire

27   Facility," and therefore the Facility "eliminated SWSL1 as a

28   discharge point." (K. Scott Decl. Opp'n Pl. Mot. ¶¶ 17-18, ECF

1   No. 194.)

2          Plaintiff replies that Defendants' 2010-2011 Annual

3   Report reveals the Facility did not consider SWSL2 to be

4   representative of SWSL1 since the report "affirmatively directs

5   Defendants to indicate whether they are claiming the B(7)(d)

6   exemption[,] . . . and Defendants failed to respond [in the

7   Annual Report] that they were" claiming the exemption. (Pl. Reply

8   22:15-18.)

9          Kim Scott's declaration shows the Facility did not

10  report samples from SWSL1 in the 2010-2011 Annual Report because

11  she considered SWSL2 to be representative of the entire Facility.

12  However, the 2010-2011 Annual Report prescribed that if

13  Defendants chose not to report storm water sampling from SWSL1

14  because they opined SWSL2 was representative, they needed to

15  disclose that information in their 2010-2011 Annual report.

16  Defendants did not do so. Therefore, Plaintiff's motion on this

17  issue is granted, and Defendants' motion is denied.

18                      **iii. West Gate**

19          Plaintiff argues Defendants violated Section B of the

20  General Permit by failing "to identify, sample and monitor"

21  discharges from the West Gate of the Facility. (Pl. Mot. 13:8-9.)

22  The uncontroverted facts establish the Facility's Annual Reports

23  have never reported storm water samples taken from the West Gate.

24  (Pl.'s SUF ¶ 97.) Plaintiff supports its argument that there were

25  storm water discharges at the West Gate by citing Steven Bond's

26  averments that "[i]t seemed reasonable to assume that, under high

27  flow conditions [meaning intense rainstorms] . . . there would be

28  flow out of the [West Gate]," (Packard Decl. Ex. EEE 48:19-25,

1   ECF No. 168-12), and photographs Bond took on December 11, 2014

2   showing discharge at the West Gate. (Bond Decl. ¶ 10, Ex. I,

3   CSM19396, CSM19405, CSM19408, ECF No. 167-2.) Plaintiff also

4   relies on samples requested by the Water Board showing there were

5   water discharges from the Facility's West Gate in December 2007.

6   (Packard Decl. Ex. W, CSM 000730, ECF No. 168-5.)

7           Defendants respond they were not required to sample at

8   West Gate since the Facility installed a berm, "which has

9   prevented discharges in that area[,]" and even if storm water did

10  discharge, sampling at the West Gate "would be redundant [of

11  sampling at SWSL2]." (Def. Mot. 30:3-13.) Defendants also cite a

12  portion of Jihan Gray's declaration, where she avers "[s]torm

13  water sometimes discharged from the Facility at [the West Gate,

14  but] . . . [s]ampling at the 'West Gate' would be redundant

15  because it is home to . . . many of the same BMPs as SWSL1 and

16  SWSL2," and also that she "installed a berm at the 'West Gate

17  area [in November 2014] which has completely prevented

18  discharges." (Gray Decl. ¶ 12, ECF No. 177.)

19          Gray's averments evince that water has discharged from

20  the West Gate, and therefore Section B(7) of the General Permit

21  requires Defendants to sample storm water from that location

22  unless the facility operator determines "the industrial

23  activities and BMPs" at the West Gate are substantially identical

24  to another location and "such a determination [is documented] in

25  the annual report." (General Permit p. 28.) The uncontroverted

26  facts establish that Defendants' Annual Report does not list the

27  West Gate as a discharge point, (Pl.'s SUF ¶ 97); nor does the

28  report state that the West Gate was substantially identical to

1    another discharge point. Therefore, Plaintiff's motion on this

2    issue is granted and Defendants' motion is denied.

3    ///

4                    **iv.  Southern Boundary**

5            Plaintiff argues Defendants "failed to identify, sample

6    and monitor" the <u>southwest corner at the western end of the</u>

7    <u>southern property boundary</u>," (Pl. Mot. 13:7-1), and supports its

8    argument citing Steven Bond's deposition testimony, where he

9    avers that on December 12, 2014, he observed, "discharges . . .

10   from several areas in the southwest corner" beyond SWSL2."

11   (Packard Decl. Ex. JJ, 134:1-23, ECF No. 168-7.) Further, the

12   uncontroverted facts establish the Facility's Annual Report never

13   reported storm water samples taken at this location. (Pl.'s SUF ¶

14   97.)

15           Defendants respond that the General Permit did not

16   require them to sample the "alleged southwestern discharge point"

17   since the only evidence of discharge from this location was a

18   "one-time occurrence" during "one of the largest storm events in

19   recent memory," as a result of which the Facility's "outfall pipe

20   at SWSL2 was overwhelmed and compromised," and "storm water began

21   flowing out through the pipe as well as around the pipe."

22   Defendants also rejoin that the Facility "made interim repairs to

23   the SWSL2 pipe[,] and the area has been secure in subsequent

24   storm events." (Def. Opp'n 43:10-20.) Defendants cite the

25   following portion of Kim Scott's declaration concerning the

26   matter:

27           due to the nature, size and intensity [of the
             December 11, 2014 storm event, the
             Facility's] outfall pipe at SWSL2 was
28           overwhelmed and compromised. As a result,

                                 44

> storm water began flowing out through the pipe as well as around the pipe. [The Facility] immediately made interim repairs to that location and the area has been secure in subsequent storm events.

(K. Scott. Decl. ¶ 20, ECF No. 194.) Defendants also cite Scott's declaration where she avers "any discharge from SWSL2 would be representative of the industrial activities on the entire Facility," and therefore the Facility was not required to report any storm water discharges from the southwest corner. (K. Scott Decl. ¶ 17, ECF No. 194.)

Plaintiff replies "Defendants have never claimed reduced sampling in relation to the southern boundary discharge point as required to claim the exemption under Section B(7)(d)." (Pl. Reply 24:1-3.)

Kim Scott's averments evince that storm water discharged from the southwest corner at the western end of the southern property boundary. (K. Scott. Decl. ¶ 20, ECF No. 194.) The General Permit required the Facility to sample water from the southwest corner at the western end of the southern property boundary unless, _inter alia_, the facility operator "documented [his or her] . . . determination [in the annual report that the discharge point was substantially identical to another discharge point,]" which Defendants did not do. (General Permit p. 28.) Therefore, Plaintiff's motion on this issue is granted and Defendants' motion is denied.

### c.   Failure to Take Samples

Plaintiff argues Defendants violated Section 5 of the General Permit by failing to take two storm water discharge

samples during the 2012-2013 wet season. Concerning this matter,
Section B(5)(a-b) of the General Permit states:

> Facility operators shall collect storm water
> samples during the first hour of discharge
> from (1) the first storm event of the wet
> season, and (2) at least one other storm
> event in the wet season. All storm water
> discharge locations shall be sampled. . . .
> Sample collection is only required of storm
> water discharges that occur during scheduled
> facility operating hours and that are
> preceded by at least (3) three working days
> without storm water discharges.

(Pl. RJN Ex. A General Permit p. 26-27.) Plaintiff argues "[f]or
the 2012-2013 wet season, Defendants did not report any storm
water samples to the Regional Board and certified under oath that
. . . '[t]here was no qualifying event,' . . . [h]owever, . . .
it is undisputed that storm water discharged from the Facility on
at least three [occasions] during the 2012-2013 wet season." (Pl.
Mot. 13:20-14:1.) Plaintiff contends discharges occurred November
17, 2012; December 21, 2012; and March 20, 2013.

### i. November 17, 2012

Plaintiff cites in support of its position that a
discharge occurred on November 17, 2012, the Lane Report, where
Lane provides the results from a sampling event conducted on
November 17, 2012. (Lane Decl. Ex. I. PLF014630, ECF No. 170-3.)

Defendants respond "there were no discharges" in
November 2012, and that the November 17, 2012 samples were taken
by a third-party and Plaintiff cannot demonstrate "what occurred
on that date, where the samples were taken, or when they were
taken." (Def. Opp'n 35:3-6; 35:14.) Defendants cite a portion of
Kim Scott's declaration where she avers "[o]n November 17, 2012

46

1 there was not enough rain at the Facility to generate a
2 discharge." (K. Scott Decl. ¶¶ 11, ECF No. 194.)

3      In light of the conflicting evidence on the issue of
4 whether there was a discharge at the Facility on November 17,
5 2012, each motion concerning this date is denied.

6                    **ii. December 21, 2012**

7      Plaintiff cites in support of its position that a
8 discharge occurred from the Facility on December 21, 2012, the
9 Lane Report in which Lane "presents the analytical results for
10 ... the sampling event conducted on December 21, 2012." (Lane
11 Decl. Ex. J, PLF014664, ECF No. 170-4.)

12      Defendants respond that they "do[] not believe" there
13 was a discharge from the Facility on December 21, 2012, citing to
14 a portion of Jihan Gray's Declaration, and arguing that "[t]hough
15 Ms. Gray does not recall December 21, 2012 with certainty, she
16 knows and attests to her custom and practice that she <u>tries</u> to
17 complete a Wet Weather Visual Observation Form whenever it
18 rains/discharges," and since there is no form for December 21,
19 2012, this is evidence that there was no discharge from the
20 Facility that day. (Def. Opp'n 36:18-28; Gray Decl. ¶ 4, ECF No.
21 193 (emphasis added.)

22      Plaintiff replies that evidence of Gray's habit is
23 insufficient to create a genuine dispute of fact since Lane
24 analyzed samples from that date.

25      Gray's averment that she "<u>tries</u> to complete a Wet
26 Weather Visual Observation Form whenever it rains/discharges" is
27 insufficient to controvert Plaintiff's direct evidence concerning
28 the discharge on December 21, 2012. <u>See</u> Fed. R. Evid. 406

1  Advisory Committee's Note (2011) (stating the "adequacy of

2  sampling and uniformity of response are key factors" in

3  determining whether a particular behavior is a habit); see also

4  S.E.C. v. Dunn, No. 2:09-CV-2213 JCM (VCF), 2012 WL 475653, at *5

5  (D. Nev. Feb. 14, 2012) ("This court finds that, as contemplated

6  in the Federal Rules of Evidence, the term 'habit' requires more

7  consistency of action than has been shown here."). Therefore

8  Plaintiff's motion concerning this date is granted and

9  Defendants' motion is denied.

10                         **iii. March 20, 2013**

11         Plaintiff cites in support of its position that

12  Defendants failed to report a storm water discharge on March 20,

13  2013, a report showing storm water samples analyzed by KIFF

14  Analytical LLC, which states the sample date is "03/20/2013."

15  (Packard Decl. Ex. Z, CSM003763, ECF No. 168-5.)

16         Defendants respond that they were not required to file

17  a report for March 20, 2013, since the discharge occurred prior

18  to the start of business hours, citing Section 5(b)(8) of the

19  General Permit, which states in part that when a discharge begins

20  more than one hour before a facility begins its operations, the

21  facility operator "may . . . sample collection more than one hour

22  after discharge begins if the facility operator determines that

23  the objectives of the Section will be better satisfied." (General

24  Permit p. 29 (emphasis added).) Defendants cite in support of

25  their position that the rain event on March 20, 2013 began prior

26  to business hours the Wet Weather Visual Observation Form filled

27  out by Jihan Gray, which states "rain heavy through night[,]

28  sample had been discharging for several hours before 8:00 A.M."

                                   48

1  (Gray Decl. Ex. D, CSM 4268, ECF No. 193-1.)

2          Plaintiff offers no evidence from which a reasonable

3  inference could be drawn that the wet weather event on March 20,

4  2013 began less than one hour before the Facility opened.

5  Therefore, Plaintiff's motion concerning this date is denied and

6  Defendants' motion is granted.

7      **E.   California Law**

8          Plaintiff's Cal. Health & Safety Code section 25249

9  claim alleges Defendants knowingly discharged lead into sources

10  of drinking water. Plaintiff alleges Defendants violated section

11  25249 on forty-two occasions by discharging water with lead

12  concentrations above the CTR standard. Defendants seek summary

13  judgment on each of the forty-two discharges; however, Plaintiff

14  only seeks summary judgment on eighteen discharges and argues the

15  remaining twenty-four discharges present a genuine issue of

16  material fact precluding summary judgment.

17          Cal. Health & Safety Code section 25249 states in

18  pertinent part, "[n]o person . . . shall knowingly discharge or

19  release a chemical known to the state to cause cancer or

20  reproductive toxicity into water or into land where such chemical

21  passes or probably will pass into any source of drinking water."

22  "Lead has been identified as a known carcinogen and reproductive

23  toxin." Evnt'l. Law Found. v. Beech-Nut Nutrition Corp., 235 Cal.

24  App. 4th 307, 312 (2015). However, a "safe harbor exemption" in

25  Cal. Health & Safety Code section 25249.9(b) states: "section

26  25249 shall not apply to any discharge or release [if the

27  defendant can show, inter alia, that] "the discharge or release

28  is in conformity with all other laws and with every applicable

1   regulation, permit, requirement, and order."

2          Plaintiff argues it is uncontroverted that on twelve

3   dates between 2008 and 2012, samples of storm water from the

4   Facility revealed concentrations of lead in excess of the CTR

5   standards. (Pl.'s SUF ¶¶ 218-227, 232, 235-237, 250-257.)

6          Defendants rejoin there is no evidence the Facility

7   discharged or released lead into sources of drinking water since

8   the origin of the lead concentrations in the samples is unclear

9   and therefore Plaintiff has not shown lead was "discharged or

10  released" from the Facility. Defendants argue they have not

11  "discharged or released" lead as the phrase is used in section

12  25249, and cite Consumer Advocacy Grp., Inc. v. Exxon Mobile

13  Corp. ("CAG"), 104 Cal. App. 4th 438 (2002), in support of their

14  argument. The CAG court held that the words "discharge" and

15  "release" "convey movement out of a confined space such as a

16  container, not, . . . simply movement from one point to

17  another," stating:

18              "discharge or release" as used in section
                25249 refers to a movement of chemicals from
19              a confined space into the land or the water.
                The subsequent passive migration of chemicals
20              through the soil or water after having been
                so discharged or released by a party does not
21              constitute another discharge or release
                within the meaning of section 25249.
22

23  Id. at 444, 450.

24          Plaintiff has not presented evidence that the Facility

25  was the source of the lead detected in the referenced water

26  samples. Therefore its motion on this issue is denied.

27          Defendant argues even if the source of the detected

28  levels of lead is uncertain, its motion on all forty-two samples

1   should be granted for four reasons: (1) the "safe harbor

2   exemption," applies, (2) Plaintiff's TAC is insufficiently vague,

3   (3) there is insufficient evidence that any discharge was made

4   "knowingly[,]" and (4) there is insufficient evidence any

5   discharge was made "into a source of drinking water."

6        **1.   Safe Harbor**

7        Defendants argue they are protected by the "safe harbor

8   exemption" since <u>inter alia</u>, the "discharges or releases" from

9   the Facility are "in conformity with . . . every applicable

10  regulation, permit, requirement, and order." Cal. Health & Safety

11  Code § 25249.9(b). Plaintiff responds that Defendants have

12  violated the terms of the General Permit, and therefore the safe

13  harbor exemption does not apply.

14       Plaintiff presented sufficient evidence to demonstrate

15  that some of the Facility's storm water discharges violated

16  Section C of the General Permit by "caus[ing] or contribut[ing]

17  to an exceedance of . . . [the] applicable water quality

18  standards" for lead in the CTR. (General Permit. P. 4) Therefore,

19  Defendants' summary judgment motion based on the safe harbor

20  exemption is denied.

21       **2.   Vagueness**

22       Defendants argue the allegations in Plaintiff's TAC

23  concerning Plaintiff's section 25249 claim are so vague that the

24  basis of Plaintiff's claim cannot be determined. (Def. Mot.

25  32:27-28:1.) Plaintiff responds that the TAC and Exhibit D

26  attached to the TAC demonstrate its section 25249 claim is not

27  vague. Concerning this claim, Plaintiff alleges "[t]his action

28  ... seeks to remedy Defendant[s'] . . . continuing discharge or

releases of lead and lead compounds into sources of drinking water in violation of California Health & Safety Code Section 25249.5 (also referred to as 'Proposition 65')." (TAC ¶¶ 4-5.) Exhibit D, which is attached to the TAC, is a "Notice of Proposition 65 Violations" that Plaintiff sent Defendants, it states: the asserted "violations [of section 25249] involve the discharge of lead and lead compounds into sources of drinking water." (TAC Ex. D.) In light of the referenced allegations in the TAC, Defendants have not shown this claim is impermissibly vague.

### 3.   "Knowingly"

Defendants argue Plaintiff cannot show any discharge or release of lead from the Facility was done "knowingly." Plaintiff responds that Defendants "have known that the Facility discharges lead since at least the date" when Defendants received lab reports from a November 1, 2008 sampling event revealing lead in the storm water. (Packard Decl. ISO Pl. Mot. Ex. O, CSM 000660, ECF No. 168-3.) The water sample results Plaintiff references were published in Defendants' 2008-2009 Annual Report and create a genuine issue of material fact concerning whether Defendants had knowledge that the discharges or releases from its Facility contained lead. Therefore Defendants' motion based on this argument is denied.

### 4.   "Into a Source of Drinking Water"

Defendants argue Plaintiff cannot show any discharge or release of lead from the Facility "passes or probably will pass into a source of drinking water" as required to prove its section 25249 claim. Plaintiff responds that the Facility's discharges

1  probably will pass into the Wyman Ravine, which is a designated

2  source of drinking water. Plaintiff supports its position by

3  citing to John Lane's report where he states that on April 4,

4  2012, he personally "observed continuous storm water flow from

5  the Facility . . . into Wyman Ravine." (Lane Decl. Ex. A p.4, ECF

6  No. 170-1.)   Plaintiff also cites the uncontroverted fact that

7  the Wyman Ravine is a tributary of the Feather River, (Pl SUF ¶

8  265), and the text of the Basin Plan, which states the Feather

9  River is an existing source of drinking water, and "[t]he

10  beneficial uses of any . . . body of water generally apply to its

11  tributary streams." (Pl. RJN Ex. B Basin Plan ("Basin Plan")

12  II.2.00; II.4.00-II-6.00, ECF No. 166-1).

13           In light of Plaintiff's evidence, Defendants' motion on

14  this issue is denied.

15                        **IV.   CONCLUSION**

16           For the stated reasons, Plaintiff's motion for partial

17  summary judgment is GRANTED in part and DENIED in part, and

18  Defendants' motion for summary judgment is GRANTED in part and

19  DENIED in part.

20  Dated:  August 14, 2015

21

22

23  GARLAND E. BURRELL, JR.
    Senior United States District Judge

24

25

26

27

28

                                    53